**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| JAMES THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action |
| v. | ) | File No.: |
| | ) | |
| GEORGIA POWER COMPANY, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Plaintiff James Thompson submits the following Complaint for Damages and Equitable Relief against Defendant Georgia Power Company ("Georgia Power"), showing the Court as follows:

## INTRODUCTION

1.

This is an employment discrimination case arising from race and age discrimination.

2.

Mr. Thompson, a 54-year-old Caucasian man, began his career with Defendant Georgia Power's parent company, Southern Company, over thirty years ago in 1990. Despite his dedication to Georgia Power and years of excellent

performance, he was terminated for pretextual reasons effective December 11, 2020.

3.

Plaintiff asserts claims of race discrimination and retaliation in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"). Additionally, Plaintiff asserts a claim of age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. ("ADEA").

4.

Plaintiff seeks injunctive and declaratory relief, back pay and lost benefits, reinstatement or front pay in lieu thereof, liquidated damages, compensatory damages, punitive damages, and attorneys' fees and costs of litigation to remedy these civil rights violations.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.

Plaintiff has satisfied all administrative prerequisites to perfect his claims of race discrimination and retaliation under Title VII and age discrimination under the ADEA. Specifically, he timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and has now received the Notice

of Right to Sue for his claims under Title VII and the ADEA within the last ninety days.

## JURISDICTION AND VENUE

6.

Plaintiff's claims present federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a).

7.

The violations of Plaintiff's rights occurred in the Northern District of Georgia. Venue is proper under 28 U.S.C. § 1391(b) and (c), as a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the Atlanta Division of the United States District Court for the Northern District of Georgia.

## PARTIES

8.

Plaintiff James Thompson is an adult resident of the State of Georgia. Mr. Thompson resides in Pike County.

9.

Defendant Georgia Power is a domestic corporation, with its principal place of business at 241 Ralph McGill Boulevard NE, Atlanta, Georgia 30308.

10.

Defendant Georgia Power may be served with a summons and copy of the Complaint in this action by delivering process to Kristi Dow at 241 Ralph McGill Boulevard NE, Bin #10180, Atlanta, Georgia 30308.

## FACTS

### *The Start of Mr. Thompson's Career with Georgia Power*

11.

On or about August 3, 1990, Mr. Thompson began his career with Defendant Georgia Power's parent company Southern Company.

12.

Mr. Thompson worked for Atlanta Gas Light Company for thirteen years and for Defendant Georgia Power for seventeen.

13.

In 2003, Mr. Thompson began working for Defendant Georgia Power as a mid-career hire in an entry-level position as a Meter Service Representative.

14.

Mr. Thompson began working his way up in the company, first becoming a Team Lead for Customer Field Services in 2005.

15.

In 2006, Defendant Georgia Power began its advanced meter infrastructure program, deploying over 2.5 million meters across the Georgia Power footprint throughout the state of Georgia.

16.

Mr. Thompson was selected as one of two region coordinators to help manage this project and oversee the contractors in the field. Mr. Thompson's responsibilities included data transfers, inventory management, planning and logistics, and holding meetings with region leadership throughout Georgia.

17.

In 2009, Defendant Georgia Power offered a voluntary attrition program, resulting in an open Customer Service Supervisor position in Dalton, Georgia.

18.

In June 2009, Mr. Thompson filled the Customer Service Supervisor position. In this role, he was responsible for seven local payment offices, nine customer service representatives, and oversight of compliance and cash handling for these locations.

19.

In 2012, Mr. Thompson became the Service HUB Supervisor for the Northwest Region. In this role, Mr. Thompson was responsible for Defendant Georgia Power's service HUB operations: dispatching all service orders to field resources, service order completion, and daily oversight and guidance for thirteen-meter service representatives across the Northwest Region.

20.

In 2014, Mr. Thompson became Northwest Region Customer Service Manager. In this role, Mr. Thompson was responsible for four teams (totaling over seventy employees). These teams included customer service representatives in local payment offices across the region, meter service representatives, service HUB, and dispatch and energy services. While in this role, Mr. Thompson was also the chair and co-chair of the Customer Service Round Table.

***Defendant Georgia Power's 2017 Reorganization***

21.

In 2016, Defendant Georgia Power closed 104 of its 131 local payment offices across Georgia.

22.

In 2017, Defendant Georgia Power implemented a major internal reorganization, closing the remaining twenty-seven payment offices and functionalizing its Customer Services organization.

23.

Defendant Georgia Power notified its employees, and impacted employees were assessed and either offered a role in the future state of business or offered a separation plan package based on their length of service.

24.

In the Fall of 2017, Defendant Georgia Power offered Mr. Thompson a level seven role in the new organizational future state in a newly formed department (Revenue Assurance) as a Revenue Assurance Manager.

25.

Defendant Georgia Power offered Mr. Thompson this role because of his leadership experience, technical knowledge, and interpersonal relationship skills.

26.

Customer Service Leadership (Pedro Cherry, Senior Vice President of Customer Service and Operations; Louise Scott, Vice President of Customer Service; Ronnie Noble, Director of Customer Operations; and Robert Hudgins,

Credit and Collections Manager) created the newly formed Revenue Assurance team.

27.

As part of Defendant Georgia Power's reorganization, Louise Scott transitioned to a new role with Southern Company Gas, and Kevin Kastner was named the new Vice President of Customer Service.

28.

To form the new Revenue Assurance team, Defendant Georgia Power's Customer Service Leadership decided to combine two teams: (1) Revenue Protection (comprised of thirteen field investigators and one supervisor) and (2) Revenue Support (comprised of twelve specialists, one analyst, one team lead, and one supervisor).

29.

The new Revenue Assurance team was comprised of thirteen field investigators and one supervisor from the former Revenue Protection team; twelve specialists, one analyst, one team lead, and one supervisor from the former Revenue Support team; and additionally added twelve new specialists, an additional team lead, and an additional Revenue Assurance supervisor to the group.

30.

The newly formed Revenue Assurance's leadership consisted of:

- Mr. Thompson (Caucasian man) as the level seven Revenue Assurance Manager, who provided oversight and strategic support for the three teams (with direct supervision for three employees while indirectly supervising over forty employees across the entire team);

- Willie Loving (African American man) as a level six Revenue Assurance Supervisor, who provided oversight for the team responsible for identification and recovery of revenue due to electricity theft (supervising fourteen employees);

- Robin Pierce (African American woman) as a level six[1] Revenue Assurance Supervisor, who provided oversight for the team responsible for identifying identity theft and fraud through the Lease and ID Process (supervising thirteen employees); and

- Gary West (Caucasian man) as a level six Revenue Protection Supervisor, who provided oversight for the team responsible for field investigation activities (supervising thirteen employees).

---

[1] Before the 2017 reorganization, Ms. Pierce held a level seven role within Defendant Georgia Power.

*Early Issues Within the Revenue Assurance Team*

31.

In September 2017, Mr. Thompson met with Director of Customer Operations Ronnie Noble to discuss Mr. Thompson's new role, set expectations, and begin the transition.

32.

During this discussion, Noble told him that the Revenue Protection and Revenue Support teams had historical claims of unfair treatment, racial discrimination, and retaliation.

33.

Noble explained that both teams had pending Workplace Ethics Concerns based on those same claims.

34.

Around the same time, Credit and Collections Manager Robert Hudgins and Lisa Glover with Human Resources also told Mr. Thompson about the same historical claims of unfair treatment, racial discrimination, and retaliation.

35.

As Mr. Thompson assumed the Revenue Assurance Manager role, he established relationships within his team. Mr. Thompson tried to give the Revenue

Protection and Revenue Support teams a fresh start with new leadership and additional resources (including additional employees and new technology to aid with workload and support).

36.

During the first few months of the newly formed Revenue Assurance Team, Mr. Thompson and the level-six supervisors assessed the former teams' processes and past practices for improvement.

37.

During these assessments, Willie Loving, one of the two Revenue Assurance Supervisors, stated multiple times that there was no need to change any of the processes or practices because he had created this department fourteen years ago and the processes in place worked fine.

38.

The other Revenue Assurance Supervisor, Robin Pierce, identified multiple opportunities within the Lease/ID Process where the team could gain efficiencies.

39.

Pierce's suggested changes were implemented, creating serious conflict between the two Revenue Assurance Supervisors.

40.

Mr. Thompson tried to help Loving and Pierce work better together, by holding standing meetings and finding opportunities for them to partner together to work towards building a "One Team" mindset instead of their "Team Loving" and "Team Pierce" mindset.

41.

Pierce was open to and supported Mr. Thompson's efforts. Alternatively, Loving complained.

42.

The Revenue Assurance Team held an exercise to brainstorm and come up with new ideas.

43.

During this exercise, Pierce and her team brought forth many ideas and thoughts about how to move the business forward.

44.

Conversely, Loving and his team brought forth multiple complaints around what changes had already been made and claimed that they needed to go back to the old way of doing things.

45.

Mr. Thompson met with Credit and Collections Manager Robert Hudgins and shared the results from the two Revenue Assurance Supervisors' teams.

46.

Mr. Thompson and Hudgins scheduled a meeting with Loving.

47.

This meeting soon became confrontational between Hudgins and Loving, with Loving accusing Hudgins of racial bias and discrimination, unfair treatment, and lack of support. Loving threatened to file a formal complaint against Hudgins and speak with Senior Vice President of Customer Service and Operations Pedro Cherry and Defendant Georgia Power's CEO Paul Bowers about Hudgins.

48.

Following the meeting, Hudgins directed Mr. Thompson to document Loving's conduct and to continue documenting Loving's conduct and behavior going forward, Loving's performance, and Loving and his team's ongoing and resurfacing claims.

### *Change in Leadership as Tensions Continue*

49.

In March 2018, Director of Customer Operations, Ronnie Noble, announced

his retirement.

50.

Based on information and belief, Noble retired after Loving accused him and other past leadership of racism.

51.

Steven Dingler (Caucasian man) assumed the Director of Customer Operations role.

52.

Coming into this role, Defendant Georgia Power informed Dingler about the concerns from the Revenue Protection Investigators around race, favoritism, and lack of opportunities for minorities. He was also informed about the concerns that some members of Revenue Support had regarding lack of support, inadequate compensation levels, and feeling undervalued.

53.

Susan Williams (Caucasian woman), an employee on Loving's team, brought forth concerns in which she claimed the team had been mistreated in the past because of the team's racial makeup (majority African American).

54.

Loving also supported Williams's comments and complained to Mr.

Thompson on multiple occasions that he felt that he had been passed over for opportunities and had been treated unfairly.

55.

As racial tension and social justice concerns escalated around the nation, Defendant Georgia Power began to emphasize driving social change from within.

56.

Defendant Georgia Power sent its leaders, including Mr. Thompson, to racial awareness training led by Al Vivian, where sensitive topics and issues were addressed, including race, racism, and color.

57.

In or about July 2019, a conversation occurred at the office between Pierce and a member of Loving's team.

58.

The employee felt that she was mistreated and filed a Workplace Ethics Complaint against Pierce.

59.

Also, in or about July 2019, a conversation took place at work between Susan Williams and Credit and Collections Manager Robert Hudgins.

60.

Hudgins asked Williams to join him in Loving's office to continue the conversation around Williams's ongoing concerns.

61.

Williams felt she had been mistreated and filed a Workplace Ethics Complaint against Hudgins.

62.

Workplace Ethics investigated both concerns, and they were both substantiated.

63.

Though Mr. Thompson was not named in either Workplace Ethics Complaint, Mr. Thompson was nonetheless given a twelve-month written reprimand alleging failure to lead because of Loving and Pierce's inability to work together.

64.

Hudgins was removed from his role and given the option to take a demotion or retire.

65.

Soon after, Hudgins retired.

66.

In or about November 2019, Stacy Conner (Caucasian woman) assumed the Credit and Collections Manager position.

### Meetings on August 12, 2019

67.

On or about August 12, 2019, Dingler and Mr. Thompson held two meetings—the first with Pierce and the second with Loving.

68.

During the first meeting with Pierce, Dingler told Pierce that the Workplace Ethics Complaint had been substantiated, and therefore, she was placed on discipline and removed from her leadership role. Dingler further informed Pierce that she was being removed from the Revenue Assurance Team and being moved to Billing Services.

69.

During the second meeting with Loving, Dingler told Loving that going forward, he would be the only Revenue Assurance Supervisor.

70.

On several occasions, Loving had previously told Dingler and Mr. Thompson that he felt that the team only needed one Revenue Assurance Supervisor.

71.

Loving became upset that Pierce was being removed and that he was going to be the only Revenue Assurance Supervisor.

72.

Loving claimed that Dingler accused him of being part of the problem when the issue was really Pierce.

73.

Loving further claimed that other employees felt that he was being treated unfairly as a Black man.

74.

Loving told Dingler and Mr. Thompson that he wanted to take a "package" and leave Pierce with the mess she had created.

75.

Loving said he was going to email Senior Vice President of Customer Service and Operations Pedro Cherry and Defendant Georgia Power's CEO Paul Bowers about the situation.

76.

After the meeting with Loving concluded, Dingler informed Mr. Thompson that Vice President of Customer Service Kevin Kastner told him that he spoke with

Cherry about the situation with Loving.

77.

Dingler further informed Mr. Thompson that Cherry had said he had enough with Loving's behavior, and that Mr. Thompson had his support to hold Loving accountable for his actions and behaviors going forward.

78.

Dingler instructed Mr. Thompson to continue documenting Loving's performance and behaviors and the team's ongoing concerns and perceived issues.

79.

Dingler stated that he would let Kastner know about the situation, so that he could inform Cherry and Bowers.

80.

Dingler further stated that Mr. Thompson had his full support.

81.

The day after the meeting with Loving, Dingler called Mr. Thompson to inform him that Kastner and Cherry had given Mr. Thompson their full support.

<u>The Aftermath</u>

82.

Before Pierce's removal, Susan Williams pulled a focus group together

consisting of the entire Revenue Support Team (except for one employee who chose not to participate) to meet with Kevin Kastner to discuss Pierce's leadership and other concerns regarding Revenue Assurance.

83.

Mr. Thompson and other members of leadership were not included in Williams's focus group.

84.

During Williams's meeting with Kastner, Williams raised several concerns about Pierce's leadership, communication, job levels, work being performed, and newly implemented technologies not working.

85.

Following Pierce's removal, several team members met with Dingler to voice their concerns about the decision to remove Pierce.

86.

The team members also told Dingler that Loving covers for Williams and his other team members who were not supportive teammates.

87.

Mr. Thompson worked with Loving to reset expectations for the combined team, to determine which areas they should focus on to provide training, utilize new

technology tools, and move towards healing.

88.

During this time, additional Workplace Ethics Complaints were made in another department in Customer Service against Robert McAdams (Caucasian) (Dispatch Supervisor) and Bo Braswell (Caucasian) (Field Services Manager) alleging racial bias and unfair treatment.

89.

According to Dingler, the claims against McAdams and Braswell were substantiated.

90.

Dingler disciplined McAdams and Braswell.

91.

McAdams was removed from his leadership role and placed into a new Project Coordinator position created by Dingler.

92.

McAdams then reported to Mr. Thompson.

93.

Based on information and belief, in or about September 2019, Braswell went to Cherry with concerns over his situation, level of discipline, and reputation.

Braswell asked Cherry to have his name cleared.

94.

In or about November 2019, Dingler reduced Mr. Thompson's discipline from a twelve-month written reprimand to a six-month oral reminder.

95.

Dingler stated that he liked how Mr. Thompson responded to the situation with Loving and his leadership.

### *Future State Discussions Begin*

96.

In 2019, Defendant Georgia Power began discussions regarding budget and financial targets.

97.

Defendant Georgia Power asked Dingler and his leadership team, including Mr. Thompson, to perform a budget reduction exercise.

98.

Previously, in 2018, Mr. Thompson and Robert Hudgins developed a future state concept and strategic plan for Revenue Assurance.

99.

At the time, the two proposed reducing the number of Revenue Assurance

Supervisors from two supervisors down to one.

100.

This reduction later occurred when Robin Pierce was removed from Mr. Thompson's team and reassigned, leaving Loving as the remaining Revenue Assurance Supervisor.

101.

At the time, Dingler supported the concept, including its structure and associated cost savings.

102.

However, Dingler stated that it was not the time for the concept's implementation.

103.

As part of the exercise in 2019, Mr. Thompson suggested several versions of his earlier future state concept and strategic plan for Revenue Assurance to meet the financial target Defendant Georgia Power had given him.

***Defendant Georgia Power Responds to Racial Justice Movement***

104.

In the Summer of 2020, Defendant Georgia Power began to hold meetings about the ongoing social and racial justice discussions occurring throughout the

nation.

105.

Defendant Georgia Power sent out communications related to racial tensions and pledged to act and redouble ongoing efforts on diversity, inclusion, and acceptance.

106.

Defendant Georgia Power instructed leadership to hold Diversity & Inclusion (D&I) meetings and small group sessions to discuss sensitive topics. They were told to "become comfortable with being uncomfortable" and have these discussions on an ongoing basis.

107.

Defendant Georgia Power sent employees, including Mr. Thompson and other members of leadership, five webinars (covering critical race theory, systemic racism, white privilege, Black Lives Matter, and other race related topics) with the expectation that the webinars would be viewed and that discussions would be proctored by leadership regarding the content as it related to the social landscape.

108.

The format of these sessions varied between the Southern Company companies and between Georgia Power's departments.

109.

Based on information and belief, some companies and departments brought in trained facilitators to proctor the discussions.

110.

However, instead of bringing in facilitators, the Customer Service department tasked leadership with leading the D&I meetings and small-group discussions.

111.

Between July and October 2020, Customer Operations held eighteen small group discussions across its department where employees were asked to engage and participate.

112.

Supervisors or an employee acting as a Diversity and Inclusion Coordinator facilitated these discussions. The managers across Customer Operations were the participants for the Q&A portion of the webinars.

113.

During the discussions, Dingler and Kastner encouraged questions. If none were asked, Dingler and Project Manager Courtnee Williams gave Mr. Thompson, along with other managers, questions to ask and answer to help facilitate the discussions.

114.

Defendant Georgia Power forced Mr. Thompson to facilitate these raw, emotional, and racially charged conversations while unequipped with the training, information, tools, expertise, and resources needed to address such sensitive and heated topics.

115.

As part of these discussions, Dingler forced Mr. Thompson and other white employees to discuss their alleged "white privilege."

116.

Because of the charged subject matter, these dialogues often became racially hostile.

117.

During one discussion in which Mr. Thompson was forced to talk about his "white privilege," Mr. Thompson recounted how he was raised and that as a Christian, you treat others how you want to be treated, and you love one another. An employee replied, "How do I know you're not a racist? The KKK said they're Christians."

118.

After this discussion, Dingler merely told Mr. Thompson that he was

impressed with how Mr. Thompson handled that interaction.

119.

If Caucasian male managers did not engage or talk about their "white privilege", Dingler would tell them during debriefings that he was disappointed that he did not hear from them, and they needed to be more vocal about things.

120.

During several meetings, Dingler told the small groups that there was racism in Customer Service.

121.

Mr. Thompson felt very uncomfortable about facilitating the D&I conversations and being forced to talk about his "white privilege" or whether he was racist.

122.

One of Mr. Thompson's Caucasian male employees approached him because he felt uncomfortable talking about his race and his "white privilege" because of his difficult upbringing.

123.

Mr. Thompson encouraged the employee to mention how he felt to Kastner and Dingler because they encouraged feedback.

124.

After voicing his feelings to Kastner, the employee told Mr. Thompson that Kastner told him, "I understand your story, but right now is not the time."

125.

Throughout this time, Mr. Thompson had discussions almost daily with his direct report, Credit and Collections Manager Stacy Conner, about Defendant Georgia Power's D&I initiatives.

126.

Mr. Thompson repeatedly told Conner that he felt uncomfortable having to discuss his race and "white privilege."

127.

Mr. Thompson voiced concerns about Dingler repeatedly telling the employees he supervised that there was racism in Customer Service.

128.

Mr. Thompson voiced further concerns that the conversations could result in future complaints of racial bias against him.

<u>Interview with Third-Party Attorney</u>

129.

In July 2020, Workplace Ethics contacted Mr. Thompson regarding an inquiry

into the historical claims and ongoing issues across Customer Service.

130.

Workplace Ethics informed Mr. Thompson that a third-party attorney would interview him as part of the inquiry.

131.

On or about July 23, 2020, Mr. Thompson was required to meet with attorney Tashwanda Pinchback Dixon of Balch & Bingham.

132.

The interview lasted about one hour.

133.

A large part of the interview focused on Loving's performance ratings for 2018 and 2019.

134.

Dixon asked Mr. Thompson why he gave Mr. Loving a "Meets Expectations" rating instead of a higher performance rating.

135.

Mr. Thompson explained that based on Loving's performance and behavior, he had not demonstrated actions that warranted a higher rating.

136.

Mr. Thompson further explained that when determining performance ratings, managers used a matrix provided by human resources.

137.

Even though he had had the full support of management in his ratings of Loving, Dixon's interview of Mr. Thompson was aggressive and combative, bordering on rude.

138.

Absent from Dixon's line of questioning was the fact that Loving refused to sign his 2017 review delivered to him by Mr. Thompson where he was rated "High Meets."

139.

Loving's 2017 review was determined by Loving's previous supervisor, not Mr. Thompson.

140.

Loving voiced no concerns to Mr. Thompson during discussions of his performance reviews for 2018 or 2019, which he signed without objections.

Phone Call on August 19, 2020

141.

Because of the almost daily conversations between Conner and Mr. Thompson about their concerns with Defendant Georgia Power Company's D&I initiatives, Conner asked Mr. Thompson to schedule a meeting with Southern Company Senior Counsel Kristina Klein.

142.

On or about August 19, 2020, Conner and Mr. Thompson met with Klein.

143.

During the meeting, Conner and Mr. Thompson voiced their concerns about Defendant Georgia Power's D&I initiatives.

144.

Mr. Thompson told Klein that he was concerned with what Defendant Georgia Power asked him to do during the D&I meetings.

145.

Mr. Thompson further told Klein that he was worried that what was said at the D&I meetings put them at risk or could be used against them.

146.

Mr. Thompson explained that the methodology used during the D&I

initiatives made it more difficult to manage or coach employees.

147.

Mr. Thompson described an exercise they did during a D&I meeting called, "I am, but I am not."

148.

Klein replied that she would have been cringing the entire time during that exercise, and that was a decision made by the company separate from their lawyer saying in the corner, "Don't do that."

149.

The three also discussed concerns about complaints made by Loving and Williams of racial bias and retaliation.

***Future State Discussions Continue***

150.

In September 2020, Dingler invited Mr. Thompson to the team discussing Defendant Georgia Power's future to introduce his 2019 future state concept and strategic plan for Revenue Assurance.

151.

Dingler explained that to meet Defendant Georgia Power's financial ask, the Revenue Assurance team would be reduced by two employees, and the Revenue

Protection team would be reduced by three employees.

152.

Dingler told Mr. Thompson that leadership had decided to eliminate the Revenue Assurance Supervisor position filled by Loving.

153.

Beginning in or about May 2020, Conner told Mr. Thompson on multiple occasions that leadership had decided to eliminate the Revenue Assurance Supervisor position filled by Loving.

154.

Dingler told Mr. Thompson that the reporting structure for the team would be for specialists, team leads, and analysts, along with field investigators and their supervisors, to report directly to Mr. Thompson.

155.

This reporting structure aligned with the other teams' reporting structures throughout the organization, with direct reports reporting to a manager with no supervisor.

156.

Dingler asked Mr. Thompson to work with Stacy Conner, HR Business Partner John Demarest, and Project Manager Courtnee Williams to deploy the

changes.

### 157.

After the financial ask was made for Customer Service to reduce cost further, Mr. Thompson put together several recommendations for Dingler and Conner to consider for Customer Service to meet the financial reduction target and to align the department with the same reporting structure as other departments in customer operations.

### 158.

These options included eliminating Loving's supervisor position pursuant to Dingler's and Conner's previous decision and direction.

### 159.

Mr. Thompson did not initiate the decision to terminate Loving.

### 160.

Mr. Thompson did not recommend Loving's termination independent of the decision previously communicated by Dingler and Conner.

### Meeting on October 8, 2020

### 161.

On or about October 8, 2020, Mr. Thompson attended a meeting with Klein, Dingler, Conner, and Demarest to discuss plans for the future state, including

Loving's termination.

162.

During the meeting, Klein noted that Mr. Thompson was "whiter" and less likely to complain than Mr. Loving.

163.

Klein told the team to continue working with her regarding how to proceed with the transition.

### Mr. Thompson's Unlawful Termination

164.

Before the October 8 meeting, Mr. Thompson communicated with Conner almost daily to coordinate the transition.

165.

After this phone call, Mr. Thompson did not hear anything further about plans for future development.

166.

When Mr. Thompson reached out to Conner, she responded with short responses, such as that she was in a meeting or would get back to him soon.

167.

Then, on November 9, 2020, Dingler notified Mr. Thompson, during a

meeting with Demarest and Conner, that his job had been impacted and that he had not been selected for a role in Defendant Georgia Power's future state.

168.

Defendant Georgia Power decided that the optics of terminating Loving was bad or too risky because he is African American, so Defendant Georgia Power instead terminated Mr. Thompson because he is white.

169.

Mr. Thompson was offered a separation package based on his years of service.

170.

Dingler informed Mr. Thompson that he could apply for jobs within Defendant Georgia Power until December 11, 2020. After that date, if he had not found a position, Mr. Thompson would be terminated.

171.

After the meeting, Mr. Thompson began applying for positions within the company, including Supervisor positions with Advanced Metering Infrastructure (AMI) and Forestry & Right of Way.

172.

Between November 9 and November 20, 2020, Mr. Thompson reached out to

several managers regarding job positions, including Wesley Granade (Customer Operations; Manager for AMI team), Lisa Jarrad (Customer Service; Strategic Systems and Planning Support Manager), Dan Breuer (Forestry & Right of Way), and Stacy Conner.

173.

Based on information and belief, on or about November 13, 2020, Granade voiced to Conner and Bo Braswell that he was excited that Mr. Thompson applied for the AMI Supervisor opening on his team.

174.

The morning of November 20, 2020, Conner spoke with Mr. Thompson about positions he was applying for.

175.

Conner told Mr. Thompson that he should apply for the open Revenue Assurance Supervisor position on her team.[2]

176.

Conner said, "If you put in for the job, I'll hire you for it tomorrow."

---

[2]     The Revenue Assurance Supervisor position was open because a few days after Mr. Thompson was notified of his termination, Willie Loving announced his retirement.

<u>Phone Call regarding Performance Reviews on November 20, 2020</u>

177.

On November 20, 2020, Kastner and John Hood (Vice President of Human Resources) contacted Mr. Thompson.

178.

Kastner and Hood told him that Defendant Georgia Power investigated a concern regarding Willie Loving's treatment and his performance ratings for 2018 and 2019.

179.

Based on information and belief, the investigator was attorney Tashwanda Pinchback Dixon of Balch & Bingham.

180.

Kastner further shared that the investigation found instances of Mr. Thompson's behavior and decisions that substantiated claims of unfair treatment.

181.

Kastner explained that the investigator found that the written performance review documents did not support the ratings that Mr. Thompson gave Loving and that the ratings were lower than what they should have been based on the investigation.

182.

Kastner further explained that the comments in Loving's review did not align with what Mr. Thompson told her during his interview.

183.

Kastner told Mr. Thompson that his behavior rating for the year would be "Does Not Meet Expectations," and his overall rating would be "Partially Meets."

184.

Kastner stated that these ratings would impact Mr. Thompson's performance bonus.

185.

Kastner further stated that the investigation results and Mr. Thompson's performance rating would impact Mr. Thompson's ability to be competitive applying for positions within Defendant Georgia Power.

186.

Mr. Thompson asked Kastner whether he would be allowed to see the investigator's report.

187.

Vice President of Human Resources John Hood replied that Mr. Thompson would not be allowed to see the investigator's reports.

188.

Defendant Georgia Power did not allow Mr. Thompson to review or dispute the report.

Background Information about Performance Reviews

189.

Defendant Georgia Power employees' bonuses were based, in part, on their performance reviews.

190.

Defendant Georgia Power had an expectation that only 20% of the employees that reported to each manager could get a review above "Meets Expectations."

191.

Since Mr. Thompson assumed a position in leadership in 2009, upper management and HR spoke with leadership on a nearly annual basis about performance reviews, emphasizing that "Meets Expectations" should be the standard review.

192.

During a leadership meeting on or about September 5, 2018, Vice President of Customer Service Kevin Kastner told a story about receiving a "Needs Improvement" performance review and how it helped his development.

193.

Kastner told managers to get more "comfortable" giving "Meets Expectations" ratings and to get the employees that reported to them more comfortable with receiving "Meets Expectations" reviews.

194.

When it was time for performance reviews, Mr. Thompson met with the Credit and Collections Manager (depending on the year, Hudgins or Conner) and his peer managers.

195.

During these performance review meetings, the managers and supervisors discussed, debated, and formed a consensus about each employee's performance review rating.

196.

If a manager or supervisor wanted to give an employee a rating higher or lower than "Meets Expectations," there needed to have strong documentation to explain the reasoning.

197.

Managers and supervisors regularly gave input about employees that did not report directly to them.

198.

After the meeting, Mr. Thompson submitted a spreadsheet with his employees' performance ratings to the Credit and Collections Manager.

199.

Loving was not the only employee or supervisor to whom Mr. Thompson gave a "Meets Expectations" rating.

200.

For example, in 2018 and 2019, Mr. Thompson also gave a "Meets Expectations" rating to Revenue Protection Supervisor Gary West, who is white.

201.

Since Mr. Thompson assumed a position in leadership in 2009, he has included positive feedback on performance reviews with a "Meets Expectations" rating.

### *Defendant Georgia Power's Continuing Retaliation*

202.

Based on information and belief, following the November 20 phone call, Kastner contacted Defendant Georgia Power managers across Customer Service with job openings posted and instructed them not to consider Mr. Thompson for any positions.

42

203.

About a week after the November 20 phone call, Mr. Thompson received automated rejection emails regarding the AMI and Forestry & Right of Way positions he had applied to.

204.

Conner stopped encouraging Mr. Thompson to apply for the Revenue Assurance Supervisor position on her team.

205.

Scott Whitmire (AMI Sales Manager) reached out to Mr. Thompson about an open position in his department. Whitmire said he would talk to his manager Sid Rowser about Mr. Thompson's interest in the position, and they would get back to him quickly.

206.

A few days later, Whitmire informed Mr. Thompson that they were going to close that job opening.

207.

On December 11, 2020, Mr. Thompson's career with Defendant Georgia Power ended with his termination.

208.

Mr. Thompson did not sign Defendant Georgia Power's separation package.

209.

Based on information and belief, members outside Mr. Thompson's protected class (54-year-old white male) assumed Mr. Thompson's job duties.

210.

Based on information and belief, younger employees assumed Mr. Thompson's job duties.

211.

Defendant Georgia Power's conduct has damaged Mr. Thompson's ability to find employment.

212.

Since his termination, Mr. Thompson has been actively searching for employment.

213.

Despite his years of experience and qualifications, Mr. Thompson has been unable to find employment until very recently, but at a substantially reduced rate of compensation. Before his recent hire, he interviewed successfully for a position outside Georgia Power, but based on information and belief, the potential

employer, after contacting Georgia Power officials, decided not to hire him.

## COUNT I
## RACE DISCRIMINATION
***Race Discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.***

214.

Plaintiff incorporates all the preceding paragraphs of this Complaint by reference as if they were fully set forth herein.

215.

Plaintiff is a member of a protected class in that he is Caucasian.

216.

At all relevant times, Plaintiff was an "employee" of Defendant Georgia Power as that term is defined by Title VII, 42 U.S.C. § 2000e *et seq*.

217.

At all relevant times, Defendant Georgia Power was an "employer" as that term is defined by Title VII, 42 U.S.C. § 2000e *et seq*.

218.

Defendant Georgia Power subjected Plaintiff to numerous adverse employment actions on the basis of his race, including, but not limited to: (a) subjecting Plaintiff to disparate treatment; (b) terminating his employment; (c) giving him a negative performance review, which negatively impacted his bonus

and his ability to find employment within the company; (d) further impeding his ability to find employment within the company by notifying managers not to hire him; and (e) on information and belief, disparaging him to one or more potential employers

219.

Defendant Georgia Power lacks any legitimate justification for subjecting Plaintiff to the adverse employment actions complained of above, and/or any such purported justifications are mere pretext for race discrimination.

220.

The above-pled actions of Defendant Georgia Power constitute race discrimination in violation of Title VII of the Civil Rights Act of 1964.

221.

The actions of Defendant Georgia Power in subjecting Plaintiff to the adverse actions complained of above were willful, deliberate, and intended to cause Plaintiff harm, and/or were committed with reckless disregard for the harm caused to Plaintiff, and were in derogation of his federally protected rights.

222.

Mr. Thompson's race was a "motivating factor" in the decisions by Defendant Georgia Power to subject him to discrimination on the basis of his race

as pled above, even if the race of Plaintiff was not the only factor that motivated the decision of Defendant to subject Plaintiff to race discrimination.

223.

As a direct and proximate result of Defendant Georgia Power's violations of Title VII, Plaintiff has suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

224.

As a result of the above-pled violations of Title VII, Plaintiff is entitled to recover his lost wages and economic benefits of his employment, compensatory damages for emotional distress, as well as front pay and other equitable relief, and all other legal and equitable relief provided for by Title VII and all statutes providing for relief for violations of Title VII.

**COUNT II**
**RETALIATION**
*Retaliation in violation of Title VII of the Civil Rights Act of 1965, as amended, 42 U.S.C. § 2000e et seq.*

225.

Plaintiff incorporates all the preceding paragraphs of this Complaint by reference as if they were fully set forth herein.

226.

Plaintiff is a Caucasian citizen who engaged in statutorily protected activity

by objecting to and complaining against race discrimination prohibited by 42 U.S.C. § 1981 as well as Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

227.

Title VII prohibits Defendant Georgia Power from retaliating against Plaintiff because he opposed, objected to, and complained against race discrimination prohibited by 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

228.

Defendant Georgia Power subjected Plaintiff to retaliation because he opposed, objected to, and complained against illegal race discrimination by taking various retaliatory actions against him including, but not limited to: (a) terminating his employment; (b) giving him a negative performance review, which negatively impacted his bonus and his ability to find employment within the company; (c) further impeding his ability to find employment within the company by notifying managers not to hire him, on the basis of his exercise of federally protected rights as compared with employees who did not engage in similar statutorily protected activity; and (d) disparaging him to one or more potential employers.

229.

The above-pled retaliatory conduct toward Plaintiff constitutes unlawful retaliation against Plaintiff in violation of Title VII.

230.

Defendant's actions were willful, wanton, and intentionally directed to harm Plaintiff.

231.

Defendant's actions were reckless and were taken in willful disregard of the probable consequences of its actions.

232.

As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

233.

Pursuant to Title VII, Plaintiff is entitled to damages in amount to be determined by the trier of fact, including back pay and lost benefits, front pay and/or reinstatement, compensatory damages, punitive damages, attorneys' fees and costs of litigation, and all other relief recoverable under Title VII and statutes providing for relief under Title VII.

## COUNT III
## RACE DISCRIMINATION
### *Race Discrimination in violation of 42 U.S.C. § 1981*

234.

Plaintiff incorporates all the preceding paragraphs of this Complaint by reference as if they were fully set forth herein.

235.

Plaintiff and Defendant were parties to an employment agreement under which, *inter alia*, Plaintiff worked for Defendant and Plaintiff was compensated for his work.

236.

Plaintiff performed his contractual obligations.

237.

42 U.S.C. § 1981 prohibits Defendant from discriminating against Plaintiff on the basis of race with regard to the making and enforcing of his employment contract with Defendant.

238.

Defendant violated Plaintiff's rights under 42 U.S.C. § 1981 on the basis of his race (Caucasian) by subjecting him to: (a) disparate treatment, (b) terminating his employment; (c) giving him a negative performance review, which negatively

impacted his bonus and his ability to find employment within the company; (d) further impeding his ability to find employment within the company by notifying managers not to hire him; and (e) on information and belief, disparaging him to one or more potential employers.

239.

As a direct and proximate result of Defendant's violations of 42 U.S.C. § 1981, Plaintiff has suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

240.

Defendant's actions were willful, wanton, and intentionally directed to harm Plaintiff.

241.

Defendant's actions were reckless and were taken in willful disregard of the probable consequences of its actions.

242.

Plaintiff is entitled to damages against Defendant, including back pay, compensatory damages, punitive damages, attorneys' fees, and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under 42 U.S.C. § 1981.

## COUNT IV
## RETALIATION

***Retaliatory Discipline, Retaliation in the Terms and Conditions of Employment, and Retaliatory Termination in Violation of 42 U.S.C. § 1981***

243.

Plaintiff incorporates all the preceding paragraphs of this Complaint by reference as if they were fully set forth herein.

244.

Plaintiff and Defendant were parties to an employment agreement under which, *inter alia*, Plaintiff worked for Defendant and Plaintiff was compensated for his work.

245.

Plaintiff performed his contractual obligations.

246.

Plaintiff is a Caucasian citizen who engaged in statutorily protected activity by objecting to and complaining against race discrimination prohibited by 42 U.S.C. § 1981, as well as Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

247.

42 U.S.C. § 1981 prohibits Defendant Georgia Power from retaliating against Plaintiff because he opposed, objected to, and complained against race

discrimination prohibited by 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

248.

Defendant Georgia Power subjected Plaintiff to retaliation because he opposed, objected to, and complained against illegal race discrimination by taking various retaliatory actions against him including, but not limited to: (a) terminating his employment; (b) giving him a negative performance review, which negatively impacted his bonus and his ability to find employment within the company; (c) further impeding his ability to find employment within the company by notifying managers not to hire him, on the basis of his exercise of federally protected rights as compared with employees who did not engage in similar statutorily protected activity; and (d) disparaging him to one or more potential employers.

249.

The above-pled retaliatory conduct toward Plaintiff constitutes unlawful retaliation against Plaintiff in violation of 42 U.S.C. § 1981.

250.

As a direct and proximate result of Defendant Georgia Power's unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment,

emotional distress, inconvenience, loss of income, humiliation, and other indignities.

251.

Defendant's actions were willful, wanton, and intentionally directed to harm Plaintiff.

252.

Defendant's actions were reckless and were taken in willful disregard of the probable consequences of its actions.

253.

Plaintiff is entitled to damages against Defendant, including back pay, compensatory damages, punitive damages, attorneys' fees, and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under 42 U.S.C. § 1981.

## COUNT V
## AGE DISCRIMINATION
### *Age Discrimination in Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.*

254.

Plaintiff incorporates all the preceding paragraphs of this Complaint by reference as if they were fully set forth herein.

255.

Plaintiff is fifty-four years old.

256.

At all relevant times, Plaintiff was an "employee" of Defendant Georgia Power as that term is defined by the ADEA.

257.

At all relevant times, Defendant Georgia Power was an "employer" as that term is defined by the ADEA.

258.

At the time of his termination, Plaintiff was more than qualified for the position he held based on his record of performance and length of service.

259.

Plaintiff's supervisors harbored a discriminatory animus toward older employees.

260.

Defendant Georgia Power discriminated against Plaintiff in violation of the ADEA by taking adverse actions against him, including but not limited to: (a) terminating his employment; (b) giving him a negative performance review, which negatively impacted his bonus and his ability to find employment within the

company; (c) further impeding his ability to find employment within the company by notifying managers not to hire him, on the basis of his exercise of federally protected rights as compared with employees who did not engage in similar statutorily protected activity; and (d) disparaging him to one or more potential employers.

261.

In so doing, Defendant Georgia Power knowingly and intentionally discriminated against Plaintiff on account of his age.

262.

In taking these adverse actions against Plaintiff, Defendant Georgia Power unlawfully discriminated against Plaintiff based on his age in violation of the ADEA.

263.

Plaintiff is entitled to an award of back pay and benefits, front pay, liquidated damages, injunctive relief, attorneys' fees, and all other appropriate damages, remedies, and other relief available under the ADEA and all federal statutes providing remedies for violations of the ADEA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a **TRIAL BY JURY** and that the

following relief be granted:

A. That this Court adjudicate and declare that Defendant has violated Plaintiff's federally protected rights as pled above;

B. That this Court permanently enjoin Defendant from committing similar violations in the future;

C. That this Court award Plaintiff back pay, all lost wages and benefits, pay increases Plaintiff would have received absent his unlawful termination, all other benefits of employment reducible to a dollar value and liquidated damages;

D. That this Court award Plaintiff pre-judgment and post-judgment interest as required by law;

E. That this Court award Plaintiff compensatory damages for emotional pain and suffering as determined by the enlightened conscience of a jury;

F. That this Court award Plaintiff punitive damages pursuant to Title VII, 42 U.S.C. § 1981, and all other applicable federal and state laws in an amount to be determined by the trier of fact;

G. That this Court order Defendant to reinstate Plaintiff with all compensation and benefits made retroactive to his last day of

employment or, in lieu of same, award front pay;

H. That this Court award Plaintiff his reasonable attorneys' fees and expenses; and

I. That this Court grant such additional relief as may be proper and just.

Respectfully submitted this 20th day of January, 2022.

**BUCKLEY BEAL LLP**

*/s/ Edward D. Buckley*
Edward D. Buckley
GA Bar No. 092750
edbuckley@buckleybeal.com
Alessandra T. Palazzolo
GA Bar No. 485399
apalazzolo@buckleybeal.com

600 Peachtree Street NE
Suite 3900
Atlanta, GA 30308
Tel: (404) 781-1100
Fax: (404) 781-1101

*Counsel for Plaintiff*